### A04A0235. URAPO-SANCHEZ v. THE STATE.
(598 SE2d 850)

PHIPPS, Judge.

A jury found Mariano Urapo-Sanchez guilty of trafficking in amphetamine. He appeals, arguing that (1) the state failed to rebut his entrapment defense, (2) his co-defendant's plea agreement was not properly disclosed to the jury, and (3) the trial court erred by admitting into evidence tape-recorded conversations that he had with a confidential informant. Finding no error, we affirm.

Agent Danny Weaver of the Hall County Sheriff's Office testified that in February 2002 he received information from a confidential informant (CI) that led him to begin investigating Urapo-Sanchez. Weaver wanted the CI — who was not identified and did not testify at trial — to introduce him to Urapo-Sanchez so that he could make an "undercover buy of methamphetamine or amphetamine." On February 22, the CI called Urapo-Sanchez from Weaver's office and arranged to meet him later that day at a Kmart parking lot. The CI wore a recording device and taped the call in Weaver's presence.

The CI and Weaver drove together to Kmart and met Urapo-Sanchez. Weaver told Urapo-Sanchez that he wanted to buy five pounds of methamphetamine but did not yet have enough money.[1]

---

[1] Weaver testified that he had also said that he wanted to buy five pounds of marijuana, but

Urapo-Sanchez gave Weaver a price for the drugs and told him that they would be available the next weekend.

On February 25, the CI placed another recorded telephone call from Weaver's office to Urapo-Sanchez and arranged a second meeting at the Kmart parking lot. The CI and Weaver rode together, and Urapo-Sanchez arrived with Alberto Maldonado-Reyes. Urapo-Sanchez told Weaver that he had not yet procured the drugs that Weaver wanted but that Maldonado-Reyes had a pound of methamphetamine for sale for $12,000. Weaver said that he did not want the pound but preferred to wait until at least four pounds were available. Weaver testified that he understood that Urapo-Sanchez would call him "whenever he knew something."

On February 26, Urapo-Sanchez called Weaver and said "[t]hat he was ready to do the 4 pound deal." He later called back and said that there was a problem that he would tell Weaver about when they met. They met later that day at the Kmart parking lot. Urapo-Sanchez said that he could get only two pounds, six ounces of drugs, not the full four pounds that Weaver wanted. Weaver agreed to buy the amount that Urapo-Sanchez had. Urapo-Sanchez told Weaver to go to Vaughndale Circle, where his friend was waiting with the drugs. Weaver said that he preferred to go somewhere "out in the open where [he] would be less likely to get robbed." Urapo-Sanchez assured Weaver that because the CI was their mutual friend, they also were friends and "everything would be okay." Finally, Urapo-Sanchez agreed that Weaver would meet the friend at a different location — a nearby car wash.

Weaver drove to the car wash, where Maldonado-Reyes approached him. Weaver asked to see the drugs, and Maldonado-Reyes pulled a "brick of amphetamine out from the back of his pants and . . . handed [it] to [Weaver]." Maldonado-Reyes then took the drugs back, and Weaver pretended to retrieve his money. But when Weaver opened the door of his vehicle, Maldonado-Reyes ran away.

Both Maldonado-Reyes and Urapo-Sanchez were arrested and charged with trafficking in amphetamine.[2] Maldonado-Reyes pled guilty and testified for the state at Urapo-Sanchez's trial. He claimed that Urapo-Sanchez had asked him to deliver the drugs to Weaver in exchange for a payment of $1,500. He had taken the drugs to the car wash but had fled upon suspecting that Weaver was a police officer.

Urapo-Sanchez testified in his own defense, claiming that he had been the victim of coercion and entrapment. He testified that the CI,

---

that sale apparently never occurred.

[2] Although Weaver testified that he thought Urapo-Sanchez was selling methamphetamine, chemical analysis of the substance in Maldonado-Reyes's pants showed that it actually was amphetamine.

a co-worker, repeatedly had pressured him to obtain drugs for a friend named "James" and had threatened violence against Urapo-Sanchez and his family if he failed to provide the drugs. Urapo-Sanchez testified that after weeks of daily threats, he set up a meeting between the CI, "James" (who was really Weaver), and Maldonado-Reyes, a neighbor that he knew sold drugs. Urapo-Sanchez claimed that he had acted only as a middleman for Maldonado-Reyes, who did not speak English; that he had stood to make no money from the transaction; and that he had arranged it only to get the CI to leave him alone.

1. At trial, Urapo-Sanchez sought a directed verdict of acquittal on the ground that the state had failed to rebut his entrapment defense. The trial court denied the motion, but Urapo-Sanchez challenges that ruling.

The elements of entrapment are: "(1) the idea for the commission of the crime must originate with the state agent; (2) the crime must be induced by the agent's undue persuasion, incitement, or deceit; and (3) the defendant must not be predisposed to commit the crime."[3] If a defendant raises the defense of entrapment and testifies to it at trial, the state bears the burden of disproving the defense beyond a reasonable doubt.[4] Whether the state has carried its burden is a question for the jury.[5]

The record shows without dispute that the idea for the crime originated with state actors. The evidence does not clearly show, however, that the crime was induced by undue persuasion on the part of those actors. Although Urapo-Sanchez claims that his testimony that the CI threatened him went unchallenged because the CI did not testify at trial, "there is no per se rule that a defendant is entitled to a directed verdict where the informant is not called to rebut the defendant's testimony of entrapment."[6] Abundant evidence in the record undermines Urapo-Sanchez's claim of threats. Weaver testified that Urapo-Sanchez had seemed calm, friendly, and reassuring during their meetings and that he had never shown any reluctance to participate in the transaction. Urapo-Sanchez admitted that no threats occurred during his meetings with Weaver and the CI or during his recorded telephone conversations with the CI. He also admitted that he never reported the CI's alleged threats to the police or to his boss. Finally, Urapo-Sanchez conceded that he had met with Weaver and the CI every time they had asked. From this evidence, the

---

[3] *Mitchell v. State*, 249 Ga. App. 520, 522 (2) (548 SE2d 469) (2001); OCGA § 16-3-25.

[4] *Mitchell,* supra.

[5] Id.

[6] *Rapier v. State*, 245 Ga. App. 211, 213 (1) (535 SE2d 860) (2000).

jury could have concluded that Urapo-Sanchez's actions were not consistent with those of a person being coerced into committing a crime.

In addition, despite Urapo-Sanchez's claim to the contrary, there was circumstantial evidence that he was predisposed to commit the crime. He met with Weaver and the CI repeatedly and without protest; he appeared at ease during these meetings; he initiated two telephone conversations with Weaver; and he had both an out-of-town and a local supplier for obtaining a large quantity of illegal drugs. "Ready commission of a criminal act may show the element of predisposition."[7]

Because the evidence did not demand a finding of entrapment, the trial court properly denied Urapo-Sanchez's motion for a directed verdict of acquittal.[8]

2. Urapo-Sanchez contends that the jury was not accurately apprised of the deal that his co-defendant, Maldonado-Reyes, had made with the state. Maldonado-Reyes was indicted for trafficking in more than 400 grams of amphetamine, which carries a mandatory minimum sentence of 25 years' imprisonment and payment of a $1 million fine.[9] He entered a nonnegotiated guilty plea to trafficking in more than 28 (but less than 200) grams of amphetamine, which carries a mandatory minimum sentence of 10 years' imprisonment and payment of a $200,000 fine.[10] In exchange for this plea to trafficking in a lesser amount, Maldonado-Reyes agreed to testify for the state against Urapo-Sanchez. At the time of his plea, he did not know precisely what sentence he would receive. Before Urapo-Sanchez's trial, he was sentenced to 13 years' imprisonment and fined $25,000.[11]

(a) First, Urapo-Sanchez argues that the prosecutor was required to disclose the deal to the jury. It is well settled that the state must reveal any agreement, even an informal one, with a witness concerning criminal charges pending against that witness, and that a failure to make such a disclosure violates the defendant's due process rights.[12] But this rule does not require the prosecutor to tell the jury of the agreement, as long as the agreement is made known to

---

[7] (Footnote omitted.) *Mitchell*, supra at 523; see also *Wilcox v. State*, 229 Ga. App. 227, 230 (1) (493 SE2d 724) (1997).

[8] See *Rapier*, supra at 214.

[9] OCGA § 16-13-31 (e) (3).

[10] OCGA § 16-13-31 (e) (1).

[11] The judge apparently found that special circumstances justified a reduced fine.

[12] *Owen v. State*, 265 Ga. 67, 68 (2) (453 SE2d 728) (1995), citing *Giglio v. United States*, 405 U. S. 150 (92 SC 763, 31 LE2d 104) (1972).

defense counsel and defense counsel has the opportunity to cross-examine the witness about it.[13]

The record shows that the state informed defense counsel of Maldonado-Reyes's plea prior to trial and that defense counsel cross-examined Maldonado-Reyes extensively about it. Urapo-Sanchez argues that Maldonado-Reyes was "not fully forthcoming and the prosecution did nothing to clear up the matter." To the extent that Maldonado-Reyes's testimony about the details of the agreement was confusing, such confusion may have arisen because he was speaking through an interpreter or because he did not understand defense counsel's questions.[14] In any event, the record shows that Maldonado-Reyes was clear about the crux of the agreement (that he received a lesser sentence in exchange for testifying for the state) and that he was not recalcitrant or deceitful. There was no due process violation.

(b) Urapo-Sanchez also contends that the trial court erred in its attempt to clarify the nature of the agreement. In response to defense counsel's contention that Maldonado-Reyes had not fully or accurately explained the deal, the court agreed that the jury was entitled to learn the specifics of the plea agreement. The court asked defense counsel whether the jury should receive the information in the form of a stipulation from counsel or a statement by the court. Defense counsel responded, "I think you need to inform the jury what happened." The court then explained to the jury the nature of Maldonado-Reyes's plea, including reading from the agreement itself. The court also told the jury not to construe its explanation as a comment on the evidence.

Urapo-Sanchez now argues that the court's commentary violated OCGA § 17-8-57, which prohibits a judge from expressing an opinion on what has or has not been proven in a criminal case. But defense counsel invited the judge to explain the plea agreement to the jury. Accordingly, Urapo-Sanchez cannot complain on appeal that the judge erred by giving the explanation.[15] Moreover, having reviewed the court's explanation, we find that the court did not express an opinion about what had or had not been proven nor about Urapo-Sanchez's guilt or innocence.[16]

---

[13] See *Milton v. State*, 248 Ga. 192, 195 (1) (282 SE2d 90) (1981). Additionally, the prosecutor is obligated to disclose the agreement to the jury if the witness lies about it on cross-examination. Id.

[14] In response to two of defense counsel's questions about the agreement, Maldonado-Reyes responded, respectively, "How is that?" and "I don't understand."

[15] See, e.g., *Holt v. State*, 248 Ga. App. 334, 335-336 (1) (546 SE2d 83) (2001).

[16] See *Norris v. State*, 240 Ga. App. 231 (523 SE2d 80) (1999) (no violation of OCGA § 17-8-57 where judge's comments were not improper comments on evidence or defendant's guilt).

3. Urapo-Sanchez claims that the trial court erred by allowing into evidence the taped conversations he had had with the CI because there was no evidence that one of the parties to those conversations had consented to their recording. We disagree.

Law enforcement officers may intercept, record, and divulge a conversation "where at least one party thereto consents, and where the conversation is . . . in furtherance of a crime."[17] Although the CI did not testify, Weaver testified that the CI had placed a recording device in his ear, dialed the telephone, and talked to Urapo-Sanchez while Weaver sat several feet away holding a cassette recorder. This evidence was sufficient to show that the CI consented to having the conversations recorded and divulged.[18] Accordingly, the court did not err in admitting the recordings.

*Judgment affirmed. Smith, C. J., and Johnson, P. J., concur.*

DECIDED APRIL 15, 2004.

*Andrew A. Hothem*, for appellant.

*Jason J. Deal, District Attorney, Alison W. Toller, Assistant District Attorney*, for appellee.

---

[17] (Citation omitted.) *Goodwin v. State*, 154 Ga. App. 46, 48 (1) (a) (267 SE2d 488) (1980).

[18] See *Tackett v. State*, 211 Ga. App. 664, 666 (1) (440 SE2d 74) (1994) (informant's consent to having conversation monitored was implied by the fact that he allowed officer to place a "body bug" on him).